UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JASON LEOPOLD,<br><br>PLAINTIFF<br>vs.<br><br>DEPARTMENT OF JUSTICE,<br><br>DEFENDANT | Civil Action No. 1:14-cv-327 (ESH) |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff respectfully moves for partial summary judgment on the issue of whether the FBI may withhold records relating to the living persons Jordan Ross Belfort and Daniel Mark Porush on privacy grounds. A Statement of Material Facts not in Dispute and a Proposed Order are attached.

Respectfully Submitted,

_/s/ Jeffrey Light_________________

Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202)277-6213
Jeffrey.Light@yahoo.com

*Counsel for Plaintiff*

Dated: August 8, 2014

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JASON LEOPOLD,<br>PLAINTIFF<br>vs.<br>DEPARTMENT OF JUSTICE,<br>DEFENDANT | Civil Action No. 1:14-cv-327 (ESH) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

## INTRODUCTION

Plaintiff Jason Leopold is a widely published investigative reporter. *The Wall Street Journal*, *The Financial Times*, *Salon*, *CBS Marketwatch*, *The Los Angeles Times*, *The Nation*, *TruthOut*, Al Jazeera English, and numerous other domestic and international publications have published dozens of news reports he has authored over the past two decades. (Compl. ¶ 2.)

On December 30, 2013, Mr. Leopold submitted a FOIA request to the FBI seeking records about, *inter alia*, the living persons Jordan Ross Belfort and Daniel Mark Porush. After the FBI failed to timely respond to Mr. Leopold's FOIA request, he filed the present lawsuit on February 27, 2014.

In two letters, both dated April 10, 2014, the FBI responded to Mr. Leopold's requests regarding Belfort (FOIA #1255573-000) and Porush (FOIA #1255575-000). (Ex. G, H.) Both letters asserted a Glomar response, refusing to confirm or deny the

existence of responsive records. (Ex. G, H.) Based on the agreement of the parties, the Court ordered Plaintiff to file a motion for partial summary judgment on the issue of whether the FBI may categorically withhold documents relating to Belfort and Porush.

## STATEMENT OF FACTS

Belfort and Porush were co-founders of Stratton Oakmont, (Compl. ¶¶ 15, 22) a firm that practiced "pump and dump," a technique which left them rich, but their investors with worthless stock (Ex. D). The two were indicted in the United State District Court for the Eastern District of New York on September 1, 1998 for securities fraud conspiracy, securities fraud with two separate corporations, conspiracy to launder money, monetary transactions in property derived from specified unlawful activity, laundering monetary instruments (transportation, promotion, and concealment), and obstruction of a criminal investigation. (Ex. F.)

In the indictment, which is publicly available, the government alleged that between February 1993 and November 1995, both Daniel Porush and Jordan Belfort:

- Surreptitiously set up Swiss bank accounts to contravene Securities and Exchange Commission ("SEC") regulations and take advantage of the SEC exemption from required stock registration of new stock issues that is only available to non-U.S. persons ("Regulation S"). (Ex. F at 2-3.)
- Recruited individuals to smuggle large amounts of cash out of the United States to Switzerland to deposit money into their Swiss accounts to use when secretly purchasing United States securities. *Id*. at 6.

- In acquiring control over two corporations, Porush and Belfort both caused millions of shares of these corporations to be issued at rates far below market rate to entities that appeared to owned and controlled by non-U.S. entities, when in fact these entities were controlled by Porush and Belfort. *Id*. The purpose of this was to take advantage of Regulation S. *Id*.
- Before selling their shares of these corporations, Porush and Belfort inflated market demand for the stock of these corporations by having their affiliated broker-dealers encourage their clients to purchase shares of these corporations. *Id*. at 7.
- Porush and Belfort caused Stratton brokerage trading accounts to be established in the names of off-shore entities they controlled. *Id*.
- Porush and Belfort reaped substantial profits from the sale of the shares of the two corporations issued under the exemption in Regulation S. *Id*.
- Porush and Belfort used the proceeds generated under by the sale of the corporations' shares issued under Regulations S purchase additional shares of these two corporations and additional securities. *Id*.
- Porush and Belfort had the offshore entities they controlled sell the aforementioned securities back to Stratton at prices lower than the offshore companies

* * *

On December 2, 1998, Porush pled guilty to Counts 1-8 of the indictment, and subsequently on May 25, 1999, Belfort pled guilty to all charges in the indictment.

*United States v. Belfort, et al.*, Case No. 1:98-cr-859-JG [ECF dkt: 37, 40.] Belfort served 22 months in federal prison and Porush served 39 months. (Compl. ¶¶ 17, 23.)

Following his release from prison, Belfort wrote two memoirs, *The Wolf of Wall Street* and *Catching the Wolf of Wall Street*. (Compl. ¶ 18.) These tell-all books describe in detail Belfort and Porush's financial crimes, as well as the subsequent government investigation and prosecution of the two Stratton Oakmont co-founders. The relevant portions of these books are summarized below.

* * *

Jordan Belfort was surprised on the day he was arrested, even though he was aware of the ongoing FBI investigation for years beforehand and was concerned about a possible FBI investigation even before that. (Ex. A, B.) Prior to learning of the FBI investigation, Belfort worried that his and Porush's securities trading schemes could bring the attention of the FBI. In *The Wolf of Wall Street*, Belfort explains how his earliest mentor, Al Abrams, warned him and advised him about possible FBI investigations years before Belfort and Porush started their Stratton Oakmont securities scheme and began laundering money through Swiss bank accounts. (Ex. A at 1.) When concocting his money laundering scheme, Belfort was concerned with the interplay between the Securities and Exchange Commission ("SEC") and the FBI, specifically, what actions on the part of Belfort and his associates would lead the SEC to notifying the FBI. (Ex. A at 3.) This is why, when Belfort set up the money laundering scheme, he took as many precautions as possible to try to insulate himself and Porush from any liability, including using family members in other countries to invest his money. (Ex. A at 4-8.)

In recounting his tale in his first book, *The Wolf of Wall Street*, Belfort remembers how concerned he was with the possibility of an FBI investigation even when he was having seemingly innocuous conversations with his assistant. (Ex. A at 12.) Belfort was so concerned that he even began to wonder if there was a consequence behind his decision to use calling cards. (Ex. A at 13.) To illustrate his concern, Belfort included conversations with his civil attorney, Ira Lee Sorkin, discussing the criminal implications of the SEC investigation into Stratton Oakmont. (Ex. A at 14-15.) The two discussed whether a settlement with the SEC would keep the FBI from starting a criminal investigation, and they discussed the difference between the level of cooperation with authorities that Belfort's associates would engage in for a criminal versus a civil investigation. (Ex. A at 14-15.)

In January of 1994, Belfort received a phone call from Steve Burstein confirming Belfort's concerns about an FBI investigation into him and Porush. (Ex. A at 16-17.) Burstein was Belfort's wedding videographer at his second wedding. (Ex. A at 16-17.) He told Belfort that FBI agents had come to his business, Visual Image, to retrieve a copy of Belfort's wedding video. (Ex. A at 16-17.)

After receiving the phone call from Burstein, Belfort tried to find out everything he could about the ongoing investigation. Belfort called his friend Bo Dietl, a private investigator with extensive ties in the law enforcement community. (Ex. A at 18-26.) Dietl told Belfort that the name of the investigating agent was Coleman, and described Coleman's reputation and what tactics may be used to gain Belfort's cooperation. (Ex. A at 18-26.) Dietl also introduced Belfort to another FBI agent in an effort to find out more about the investigation, and in the hopes that the other agent may put in a good word with

Coleman in order to influence the investigation. (Ex. A at 18-26.) Eventually Belfort's link to Dietl proved fruitful because Dietl was able to alert Belfort that Coleman was investigating Belfort and Porush's Swiss money laundering scheme. (Ex. A at 28-29.)

During Belfort's speech to Stratton Oakmont employees announcing his retirement from the company, he felt it prudent to mention the possibility of an FBI investigation to make himself seem prescient to his employees. (Ex. A at 27.) While Belfort is in the middle of a drug binge, Dietl calls him to tell him that Agent Coleman is investigating Belfort's money laundering scheme in Switzerland. (Ex. A at 28-29.) Belfort made time to go to Switzerland to meet two of his contacts there regarding his scheme and they both assured Belfort that the United States government did not make any inquiries. (Ex. A at 30.) Gary Deluca called Belfort to tell him that two of his former business associates, Jean Jacques Saurel and Gary Kaminsky, were both indicted for money laundering. (Ex. A at 31). Belfort spoke with his criminal attorney, Greg O'Connell; Mr. O'Connell told Belfort that the investigation into Mr. Saurel did not seem to be turning against Belfort at that time. (Ex. A at 32-36.) The two also discussed whether or not Belfort's Aunt, Patricia Mellor, was alive and whether she could produce an affidavit stating that the money in the Swiss accounts belonged to her. (Ex. A at 34.)

Though Ms. Mellor was dead at this point, Belfort called his contact in Switzerland, a "Master Forger," to produce the required affidavits stating the money in the Swiss accoutns belonged to Ms. Mellor. (Ex. A at 35-36.) Agent Coleman visited Belfort's drug dealer, Todd Garrett, to tell Mr. Garrett that he would be arresting his wife, Carolyn. (Ex. A at 37.) Garrett also told Belfort that Saurel was cooperating against Belfort in the FBI investigation. *Id*. Belfort met with Garrett and his wife to discuss their involvement in

the government's case against Belfort. (Ex. A at 37-39.) Garrett was arrested for firearm possession when he was supposed to give Mr. Saurel money for Belfort's Swiss bank account; instead Carolyn delivered the money and spoke with Saurel. (Ex. A at 38.)

Belfort met with his accountant, Dennis Gaito, to think of ways to get around the FBI investigation and create explanations and alibis for how the money got to Patricia Mellor and eventually in Switzerland. (Ex. A at 39-42.) Belfort and Gaito's plan worked and Belfort thought Agent Coleman was likely upset. (Ex. A at 43-44.) The FBI arrested Belfort in front of his home for money laundering and securities fraud. (Ex. A at 46-49.) Once indicted, the U.S. Attorney told Belfort that if he did not plead guilty and cooperate, they would also indict his wife. (Ex. A at 50.)

* * *

In his second book, *Catching the Wolf of Wall Street*, Belfort recounted the FBI investigation of him and Porush in significantly more detail.

What apparently caught the eye of Coleman was Belfort's money laundering. In an effort to work around NASDAQ's refusal to list shares in which Belfort was a the majority shareholder, Belfort concocted his money laundering. Agent Coleman then investigated Belfort and his schemes for years. (Ex. B at 1-2.) The U.S. Attorney prosecuting Belfort, Joel Cohen, called Belfort's attorneys when Belfort was in a meeting with them and told them that if Belfort did not cooperate, Mr. Cohen would prosecute Belfort's wife. (Ex. B at 3-4.) Belfort made the decision to cooperate in that meeting. (Ex. B at 4.) Belfort met with Agent Coleman and another FBI Agent, Agent McCrogan in a

parking garage and then drove through the streets in an effort to ensure that Belfort's cooperation with the government would stay secret for as long as possible. (Ex. B at 5-9.)

There were a number of long sessions where Belfort told the FBI agents and prosecuting AUSAs (Joel Cohen and Michele Adelman) the full details of his various schemes and implicated approximately ninety seven different co-conspirators. (Ex. B at 10-22.) The investigating team questioned Belfort as to whether he sunk his yacht as part of an insurance scam. (Ex. B at 12.) The investigating team also questioned Belfort as to whether or not it was true that he had ten million dollars buried in his backyard. (Ex. B at 12-13.) They required Belfort to fill in the parts of his life they did not have a complete picture of to ensure that they were not blind-sided by any defense attorney when they had Belfort on the witness stand. (Ex. B at 17-18.)

Agent Coleman admitted to unsuccessfully attempting to speak with approximately fifty of Belfort's Stratton-Oakmont associates during the course of his investigation. (Ex. B at 19.) Eventually the investigating team had Belfort stop telling them about his past and to move onto the details of the crimes he committed for which the team investigated him. (Ex. B at 25-28.) AUSA Cohen wanted to know about the accountant Dennis Gaito specifically (Ex. B at 25.) They wanted Belfort to talk about his relationship with Mr. Gaito in an effort to bring prosecution against Bob Brennan, an infamous stock market criminal. (Ex. B at 29-30.)

Belfort agreed to wear a recording device during a meeting with Mr. Gaito in an effort to implicate Mr. Gaito in previous crimes. (Ex. B at 31-38.) When Belfort discussed setting up Stratton-Oakmont with the investigating team, they knew some of the people involved and had inquiries about specific members of the original group. (Ex.

B at 39.) The investigating team had Belfort wear a recording device to a meeting with David Beall. (Ex. B at 40-45.) However, during that meeting, Belfort tipped Beall off that he was wearing a recording device. (Ex. B at 44-45.)

In an effort to incriminate Gaito, Agent Coleman had Belfort go to New Jersey to speak with Gaito repeatedly. (Ex. B at 50.) Eventually the investigating team found out that Belfort alerted Beall to the fact that he was wearing a recording device during their meeting. (Ex. B at 51-61.)

Belfort also told Agent Coleman about a kickback scheme between Elliot Lavigne and him where Agent Coleman told Belfort that they were unable to indict Mr. Lavigne earlier because "there was just too much cash going in and out [of Mr. Lavigne's bank accounts] to find a pattern." (Ex. B at 62.)

Agent Coleman had Belfort meet with Gaito to get him to plan a new money laundering scheme in order to indict Gaito. (Ex. B at 63-67.) Belfort and Gaito created a new scheme that involved James Loo, as associate of Bob Brennan. (Ex. B at 66-67.) Belfort and Gaito met again to discuss their plans. (Ex. B at 68-70.) They agreed that Belfort would give Loo a $50,000 token of good faith. (Ex. B at 69.) Also, Gaito drew an intricate flow chart of just where the money would go once Belfort gave his money to Mr. Loo. (Ex. B at 70.)

Eventually Belfort had the meeting with Gaito and Loo while the FBI agents listened in. (Ex. B at 71-75.) Once the meeting was over, the participants were all arrested. (Ex. B at 71-75.)

* * *

Though more than a decade has elapsed since Belfort and Porush were indicted, the public remains interested in learning more about the criminal investigation and prosecution of these individuals. On March 20, 2014, Larry Posner, a producer with the news program Inside Edition, sent a letter to Judge Gleeson of the Eastern District of New York to discover the names of people that Belfort defrauded. Exhibit C. Mr. Posner sent this letter to find out who to interview to counteract Belfort's claims that he only defrauded the very wealthy. *Id*.

In an article written by Nick Harding for *The Independent* ("*The Independent* article"), Joel Cohen, Belfort's prosecuting AUSA characterized Belfort as, "a guy who woke up every day, seven days a week for many years, and said, What crimes can I commit today? He was looking to rip people off on a daily basis." (Ex. D.)

In *The Independent* article, Agent Coleman countered Belfort's characterizations of his victims as "very rich people" by saying many of Belfort's victims were in fact people "who could ill afford to lose that kind of money." (Ex. D.)

According to *The Independent* article, Agent Coleman and Joel Cohen investigated Belfort for years, encountering too many Belfort-loyalists to make much headway on the investigation until Belfort began smuggling money out of the country to Switzerland. (Ex. D.)

Interest in Beflort's case continues to the present. On January 24, 2014, Professor Ian Ayres of Yale Law School wrote a letter to Judge Gleeson to ask if members of the public could donate to Belfort's victim restitution fund in an effort to repay Belfort's victims. (Ex. E.)

## **ARGUMENT**

There are "two potential privacy interests at stake here. The first is Porush and Belfort's "interest in avoiding the stigma of having [their] name[s] associated with a criminal investigation." *Citizens for Responsibility & Ethics in Wash. v. United States DOJ*, 746 F.3d 1082, 1091 (D.C. Cir. 2014). The second is a "distinct privacy interest in the *contents* of the investigative files." *Id.* at 1092 (emphasis in original). Mr. Leopold addresses each in turn.

### I. THE INTEREST IN AVOIDING THE STIGMA OF ASSOCIATION WITH A CRIMINAL INVESTIGATION.

A. Legal standard

The FBI responded to Mr. Leopold's requests regarding Porush and Belfort with a Glomar response. A Glomar response is only permissible where the agency demonstrates that revealing the very existence of records would cause harm cognizable under a FOIA exception. *Wolf v. Cent. Intelligence Agency*, 473 F.3d 370, 374 (D.C. Cir. 2007). Here, the FBI[1] relies on Exemptions 6 and 7(C). (Ex. G, H.) Exemption 6 permits withholding of "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy," while Exemption 7(C) permits withholding of "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal

[1] Although the Defendant in this case is properly the Department of Justice, the FBI will be referred to throughout the brief for convenience.

privacy[.]" 5 USC § 552(b)(6) and 7(C). Because exemption 7(C) is considered to impose a higher bar for release of records, courts confronted with an assertion of both Exemptions 6 and 7(C) generally apply the stricter test applicable for Exemption 7(C) withholdings. *See e.g.*, *Roth v. United States DOJ*, 642 F.3d 1161, 1173 (D.C. Cir. 2011)("If the information withheld here was 'compiled for law enforcement purposes,' thus implicating Exemption 7(C), then we would have no need to consider Exemption 6 separately because all information that would fall within the scope of Exemption 6 would also be immune from disclosure under Exemption 7(C).")

Pursuant to Exemption 7(C), "a Glomar response may be issued in place of a statement acknowledging the existence of responsive records but withholding them, if confirming or denying the existence of the records would associate the individual named in the request with criminal activity." *Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 893 (D.C. Cir. 1995). There is generally a privacy interest in having one's name not unwarrantedly disclosed in connection with a criminal investigation because even the "mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation." *Schrecker v. United States DOJ*, 349 F.3d 657, 666 (D.C. Cir. 2003). Thus, the privacy interest at issue is "ensuring that [one's] relationship to the investigations remains secret[.]" *Roth*, 642 F.3d at 1174.

A Glomar response is not appropriate, however, where an individual has publicly disclosed an association with the agency, as the public disclosure effectuates a waiver. *See Nation Magazine v. United States Customs Serv.*, 71 F.3d 885, 894 n.8 (D.C. Cir. 1995) ("if Perot waived his right to § 7(C) protection of his identity in the first instance

by publicly claiming to have done the very things that documents responsive to the request discuss, it would follow that unless some other exemption were applicable, he had also waived his right to a Glomar response, which is simply a way of preventing disclosure of information substantively protected by one of the FOIA exceptions")(internal citation omitted). Similarly, an agency "cannot rely on an otherwise valid exemption claim to justify withholding information that has been 'officially acknowledged' or is in the 'public domain.'" *Davis v. United States Dep't of Justice*, 968 F.2d 1276, 1279 (D.C. Cir. 1992).

B. Analysis

Defendant has waived its right to assert a Glomar response in this case due to a previous official acknowledgment. *See ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir. 2013). "[W]hen a plaintiff seeks to rebut a Glomar response by establishing official acknowledgment," he must make a "showing that the agency has already disclosed the fact of the existence (or nonexistence) of responsive records, since that is the purportedly exempt information that a Glomar response is designed to protect." *Id.* The publicly available indictment of Belfort and Porush, filed by Defendant in the Eastern District of New York, establishes the existence of records responsive to the FOIA request, regardless of whether the contents of the records have been disclosed. *Id.* at 427. Given that the indictment and guilty pleas of Belfort and Porush are a matter of public record, "it is neither logical nor plausible" for Defendant to claim that disclosing the *existence or*

*nonexistence of responsive records* would reveal anything that is not already public.[2] *See id.*; *Marino v. DEA*, 685 F.3d 1076, 1081 (D.C. Cir. 2012)("[I]n the context of a Glomar response, the public domain exception is triggered when the prior disclosure establishes the existence (or not) of records responsive to the FOIA request, regardless whether the contents of the records have been disclosed.") As further evidence of official acknowledgment, FBI Special Agent Coleman, who investigated Belfort for nearly a decade, has spoken publicly to the press about the investigation. (Ex. D at 3-4.)

And, at least with respect to Jordan, there is also the fact that he has himself publicly revealed the existence of an FBI investigation of him. (Ex. A and B.) As was the case in *Nation Magazine*, 71 F.3d at 894 n.8, Belfort's public disclosure of the FBI's investigation waived any interest he may have had in the fact of the existence or nonexistence of records. See also at 1091 ("DeLay's obvious privacy interest in keeping secret the fact that he was the subject of an FBI investigation was diminished by his well-publicized announcement of that very fact.")

Because there is "no privacy interest adequate to justify its Glomar response . . . . no balancing is necessary[.]" *Wilson v. United States DOJ*, Case No. 1:13-cv-2053 (JEB), 2014 U.S. Dist. LEXIS 69547 at *21-*22 (D.D.C. May 21, 2014). The FBI there "must — at a minimum — confirm or deny whether the record[s] [Leopold] is seeking exist[]. If [they do], [the FBI] must either turn [them] over or explain the reasoning behind its withholding." *Id.* at *22.

[2] Although the indictment does not explicitly refer to the FBI, the FBI is the agency which has jurisdiction over investigations of federal crimes, except in cases where responsibility is assigned to another agency. 28 CFR §0.85. It was the FBI that arrested Belfort. (Ex. A at 34-46.)

## II. THE PRIVACY INTEREST IN THE CONTENTS OF THE INVESTIGATIVE FILES.

A. Legal standard

Once the Court has concluded that there is no privacy interest at stake in the public disclosure of the *fact* of the investigation, it should then determine whether the FBI can *categorically* withhold all records about Belfort and/or Porush based on the potential contents of the records.[3] "[A] categorical approach is appropriate only if a case fits into a genus in which the balance *characteristically* tips in one direction." *CREW*, 746 F.3d at 1095.

B. Analysis

It is not the case that *all* records about Belfort and/or Porush implicate privacy interests that outweigh the public interest. Whether or not the contents of particular files which mention or refer to Belfort and/or Porush implicate significant privacy interests will depend on the individual records. Some records about Belfort and Porush will not implicate a privacy interest because they do not have a "substantial interest in ensuring that their relationship to the investigations remains secret," *Roth*, 642 F.3d at 1174, where their status as targets of the investigation is already in the public domain. Further, their interests are diminished because they have been criminally charged (and convicted). *Cf. Citizens for Responsibility & Ethics in Wash. v. United States DOJ*, 978 F. Supp. 2d 1, 10

[3] At this stage of the proceedings, it would be premature to argue about what the FBI must *release*. The only issue before the court right now is whether the FBI must *search for and process* responsive records.

(D.D.C. 2013) ("Senator Ensign has not been criminally charged. . . . [This] fact[] lend[s] weight to his privacy interest[.]")

With regard to Belfort, his privacy interest is also much diminished because he has extensively discussed the FBI's investigation of him in his books and elsewhere. (Ex. A, B); *Kimberlin v. DOJ*, 139 F.3d 944, 949 (D.C. Cir. 1998)(subject's "statement to the press undoubtedly does diminish his interest in privacy: the public already knows who he is, what he was accused of, and that he received a relatively mild sanction").

On the other side of the scale, the public has a significant interest in learning about the FBI's investigation into Belfort and Porush, regardless of whether the investigation was proper or not. *See ACLU v. United States DOJ*, 655 F.3d 1, 14 (D.C. Cir. 2011) ("Matters of substantive law enforcement policy are properly the subject of public concern, whether or not the policy in question is lawful.") Responsive records would "shin[e] a light on the FBI's investigation" of a major financial scandal. *CREW*, 746 F.3d at 1093. The records will reveal how the FBI conducted its investigation, and Mr. Leopold is seeking the records to show how thorough the investigation was, how effective it was, why certain charges were pursued while others were not, how intrusive the investigation was, why the investigation lasted for such a long time, and whether there was any consideration of stopping the fraudulent scheme and money laundering before Belfort and Porush fleeced more investors. *See CREW*, 746 F.3d at 1093 ("Disclosure of the records would likely reveal much about the diligence of the FBI's investigation . . . . [They] may show whether [Porush and Belfort] are subjected to the same investigatory scrutiny" as less wealthy citizens.) In other words, "the relevant public interest is not to find out what [Porush and Belfort themselves were] 'up to' but

rather how the FBI . . . carried out [its] . . . statutory duties to investigate . . . criminal conduct." *CREW*, 746 F.3d at 1093.

The details of the investigation into Belfort and Porush are also of particular public interest because of the widespread publicity they have received, as well as their high public profile. *See CREW*, 978 F. Supp. 2d. at 13 ("[T]he public interest in disclosure of records relating to a single decision whether to prosecute can be substantial in some circumstances. Widespread media attention, an ongoing public policy discussion, and the public profile of the subject of the investigation all contribute to the public's interest in disclosure")(internal citation omitted). "Disclosure of the . . . investigative materials could shed light on how the FBI . . . handle[s] the investigation . . . of" major white-collar crime. *CREW*, 746 F.3d at 1093.

There is a significant public interest in revealing how the FBI conducted a major, decade-long investigation into extraordinarily wealthy individuals who perpetrated a mass fraud. Even if Porush retains more of a privacy interest than Belfort, who has published two books confessing his crimes and detailing the FBI's investigation, it cannot be said that the balance categorically tips in favor of non-disclosure, given the significant public interest at issue. *Id.* at 1096 ("Although a substantial privacy interest is at stake here, in light of the similarly substantial countervailing public interest, the balance does not characteristically tip in favor of non-disclosure.")

### III. THE COURT SHOULD COMPEL THE FBI TO PRODUCE A *VAUGHN* INDEX.

At this stage of the proceedings, Mr. Leopold is objecting to the Glomar response and the categorical withholding of records. It would make little sense, therefore, for the Court to balance the public and private interests in the abstract, without any particular records at issue. It is true that in many cases, categorical treatment is appropriate because the requester demonstrates no public interest and nothing that would diminish the subject's privacy interest. Here, however, Mr. Leopold has articulated a substantial public interest as well as the existence of circumstances that reduce or completely eliminate the targets' privacy interest. Therefore, the Court should not "make a blanket determination as to whether the public interest in disclosure outweighs the substantial privacy interests of [Porush and Belfort]. Those interests may vary with respect to each responsive document." *CREW*, 978 F. Supp. 2d at 14. The requested records may contain details that have already been revealed in the public indictment or Belfort's books, both of which are available to the public. Whether the records do contain such details, and whether that will affect the balance of interests, will be more easily determined on a document-by-document basis. *Id.*

The submission of a *Vaughn* index will not harm Porush or Belfort's privacy interests in "not being identified as the subject of an investigation—that ship has sailed." Id. at 14-15. Further, "the privacy interests of other third parties mentioned in the records but not already publicly known can be protected adequately by redaction of identifying information." *Id.* at 15. Thus, the Court should grant summary judgment to Plaintiff and order that Defendant submit a *Vaughn* index.

Respectfully Submitted,

_/s/ Jeffrey Light_________________

Jeffrey L. Light
D.C. Bar #485360
1712 Eye St., NW
Suite 915
Washington, DC 20006
(202)277-6213
Jeffrey.Light@yahoo.com

*Counsel for Plaintiff*